**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x
PRICILLA SARAF,                                      :
                                                     :
                        Plaintiff,    :       Civil Action No.
                                                     :
        v.                                           :
                                                     :       **COMPLAINT**
WEST PUBLISHING CORPORATION                          :
d/b/a THOMSON REUTERS,                               :
                                                     :       **Jury Trial Demanded**
                        Defendant.    :
-------------------------------------------------------- X

Plaintiff Pricilla Saraf, as and for her Complaint against Defendant West Publishing Corporation d/b/a Thomson Reuters ("Thomson Reuters" or the "Company"), hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      Throughout her employment at Thomson Reuters, Ms. Saraf was a stand-out performer, and a constant recipient of praise and accolades regarding her work.  In fact, Ms. Saraf was repeatedly singled-out not only for her strong sales numbers, but also her innovation and initiative in opening up new revenue streams for her team and Thomson Reuters as a whole. It was in the context of this consistent positive feedback and reinforcement that, in October of 2015, Ms. Saraf felt not only comfortable, but overjoyed, to share the news of her pregnancy with her supervisor Robert Genthner ("Mr. Genthner"), from whom she expected to receive congratulations, and reassurance that he and the Company would continue to support her during this exciting milestone in her life.

2.      However, to her shock, Ms. Saraf's disclosure was met by Mr. Genthner with concern about what her pregnancy would do for Thomson Reuters' bottom line.  Mr. Genthner immediately began to question her about how much time off she would need, and how her work

1

would be covered during her absence.  Even more troubling, within a mere 24 hours of this meeting, Mr. Genthner, for the very first time in Ms. Saraf's employment, told her that her performance "need[ed] to improve."  Ms. Saraf was puzzled by this sudden, negative feedback, particularly as Mr. Genthner had not mentioned any performance deficiencies during the previous day's discussions.

3.     Soon, Ms. Saraf noticed that more of her work and success at Thomson Reuters was now being credited to others, in an apparent attempt to nullify both her record and contributions at Thomson Reuters.

4.     Amazingly, within weeks of announcing her pregnancy, Ms. Saraf was notified that her employment would be terminated in connection with a purported reduction-in-force ("RIF"), even though lesser performing employees were retained.

5.     It is against the backdrop of this startling timeline of events that Ms. Saraf brings the instant action to redress the unlawful and discriminatory treatment she was subjected to immediately following the announcement of her pregnancy.

## NATURE OF THE CLAIMS

6.     The unlawful discrimination and retaliation described herein was committed in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*. ("FMLA"), the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq*. ("NYSHRL"), and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8-101 *et seq*. ("NYCHRL").

## ADMINISTRATIVE PREREQUISITES

7.     Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 8, 2016, and intends to file an Amended Complaint alleging violations of Title VII of the Civil Rights Act, as amended, 42 U.S.C. §§ 2000e *et seq*., and as

2

amended by the Pregnancy Discrimination Act, following the EEOC's completion of its investigation and/or issuance of a Notice of Right to Sue.

8.      Following commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

9.      Any and all other prerequisites to the filing of this suit have been met.

<u>**JURISDICTION AND VENUE**</u>

10.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under the FMLA. The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

11.     The Court also has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1332(a) and (c) as the parties are citizens of different states, and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(b).

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

<u>**PARTIES**</u>

13.     Plaintiff Pricilla Saraf is a female former employee of Thomson Reuters, and a resident of the State of New Jersey.  At all relevant times, Plaintiff met the definition of an employee and/or eligible employee under all applicable statutes.

14.     Defendant Thomson Reuters Corporation is a Delaware corporation, with headquarters at 3 Times Square, New York, NY 10036.  At all relevant times, Thomson Reuters was an employer within the meaning of all applicable statutes.

## FACTUAL ALLEGATIONS

**Plaintiff's Exceptional Performance at Thomson Reuters**

15.     Plaintiff, a lawyer admitted to practice in New Jersey, began her employment in April 2014 in the position of Business Development Executive, and was consistently praised throughout her tenure for her strong sales numbers and overall performance.

16.     Plaintiff's supervisor, Robert Genthner, repeatedly celebrated her as her team's top performer, including naming her "Employee of the Month" on multiple occasions in 2015.

17.     Mr. Genthner extolled Plaintiff's persistence and innovation in signing new clients and identified her as someone whose lead other team members should follow.

18.     By way of one example only, Mr. Genthner emailed Plaintiff's entire team to specifically commend her for turning a relationship with a partner at a global law firm with over 1,800 lawyers – a law firm with which Mr. Genthner and others had been unsuccessful in securing an introduction – into an opportunity to make a presentation about Thomson Reuters' expert witness services to the firm's entire litigation group.

19.     Moreover, even though Westlaw, Thomson Reuters' legal research platform, was not a responsibility of Plaintiff's team, Plaintiff exhibited strong, Company-first initiative when she made several introductions between partners at that law firm and the Company's national account manager, which helped in recent negotiations with respect to the Westlaw business.

20.     Furthermore, Plaintiff's exceptional performance was reflected in her sales figures.

21.     As one example, Plaintiff's mid-year 2015 review reflected that, of the Company's five Business Development Executives, 30 Case Managers, and two Account Managers, Plaintiff yielded both the highest total searches and highest new client searches.

22.     In September 2015, Plaintiff also received a special bonus for participating in a company-wide sales meeting aimed at boosting morale by teaching a course on social selling, which earned her applause for her insights.

23.     Further, for the period of September 21, 2015 through October 15, 2015, Plaintiff invoiced the highest number of Expert Intelligence Reports ("EIRs") in her team, after having won the sales incentive bonus for invoicing the highest number of EIRs in 2014.

24.     Accordingly, by both quantitative and qualitative measures, Plaintiff's performance was superior to that of her peers.

**Plaintiff Discloses Her Pregnancy and the Company Suddenly Begins to Scrutinize Her Work**

25.     On October 19, 2015, during a regularly scheduled bi-weekly, one-on-one catch-up meeting with Mr. Genthner, Plaintiff informed Mr. Genthner that she was pregnant.

26.     Plaintiff was thrilled to share her exciting news with her colleagues after the pivotal 12-week pregnancy mark had passed.

27.     However, the bulk of this 45-minute meeting became subsumed with discussion regarding Plaintiff's pregnancy, and Mr. Genthner particularly seemed interested in knowing when and how much time off Plaintiff intended to take, and concerned about how the Company could cover her accounts during her absence.

28.     This meeting ended without incident, with Mr. Genthner and Plaintiff each understanding what tasks and projects Plaintiff would be focusing on in the coming weeks.

29.     However, less than 24 hours later, Plaintiff received an email from Mr. Genthner telling her that she "need[ed] to improve."

30.     This correspondence was highly unusual, as, for the prior year-and-a-half that Mr. Genthner and Plaintiff had these one-on-one meetings, Mr. Genthner had never once sent any follow-up email to Plaintiff regarding what had been discussed, nor about any alleged areas that needed improving.

31.     Even more peculiar, the areas Mr. Genthner highlighted for "improvement" were not even ones discussed during the one-on-one meeting, and had been brought up earlier only in the context of areas in which Plaintiff's entire team could improve, not any one team member or region in particular.

32.     In addition, upon information and belief, no other member of Plaintiff's team has ever received similar follow-up correspondence from Mr. Genthner recapping any of their one-on-one meetings.

33.     Plaintiff noticed other changes in Mr. Genthner's treatment of her following her pregnancy announcement.

34.     For instance, whereas Mr. Genthner had earlier assured Plaintiff that he would address and correct certain discrepancies which had emerged regarding accounts which Plaintiff had originated that were not being credited to her (in particular, six large accounts that would have otherwise generated substantial commissions to Plaintiff), after Plaintiff disclosed her pregnancy, her efforts to rectify these errors fell completely on deaf ears, and were auspiciously ignored.

35.     In addition, even though Mr. Genthner was fully aware of Plaintiff's physical condition, Mr. Genthner curiously requested specifically that Plaintiff help break down and set

up a booth for her team at a conference that took place on October 25, 2015, and to also carry

boxes, even there were seven other team members attending the conference that could help.

36.     Coincidentally, following her pregnancy disclosure, Plaintiff's sales figures

became deflated (at an opportune time) as a result of the Company's failure to properly credit her

business efforts.

**The Suspect and Discriminatory Nature of Plaintiff's Termination**

37.     On or around November 4, 2015, just two weeks after disclosing her pregnancy,

Plaintiff was suddenly informed on a call with Mr. Genthner, Robert Alston ("Mr. Alston," Mr.

Genthner's manager), and a female Human Resources ("HR") representative that she was being

terminated as part of a purported "reduction-in-force" ("RIF").

38.     Plaintiff learned that she was the only member of the sales team that fell victim to

this RIF, and after asking for an explanation as to why she was chosen, no straight answer or any

detail as to the process was given.

39.     Rather, Mr. Alston and Mr. Genthner merely said vaguely that there were "many

factors" that had been taken into consideration, and that it was "not just performance" that

motivated the decision.

40.     Coincidentally, of the four employees who remain on Plaintiff's team, two are

men and one woman is of non-childbearing age.

41.     Plaintiff was further told that she would not be receiving a 2015 bonus, despite

being asked to continue working until December 18, 2015, and having had a very successful

sales year to date.

42.     As Plaintiff was being notified of her impending termination, she disclosed how difficult she felt it would be to find another job given that she was pregnant and expecting a child in the coming months.

43.     Upon hearing this news, the HR representative suddenly became silent.  Just seconds before the pregnancy disclosure, the HR representative had been an active participant on the call, telling Plaintiff that the Company would try to assist her in landing on her feet outside the organization, and that the Company would work with her to square away any insurance coverage-related concerns.

44.     The HR representative's silence was deafening – it was abundantly apparent that the representative had not known about Plaintiff's pregnancy status, and that this revelation, coupled with the suspicious timing of Mr. Alston and Mr. Genthner's decision to terminate Plaintiff's employment, shocked her.

45.     The decision to terminate Plaintiff's employment as part of the purported RIF also made no economic sense, as the person who would go on to take over Plaintiff's responsibilities and territory was not even based in New York City, which was the largest and most profitable territory for her team.  That person would have to travel to New York City and other areas in the northeast, creating added and unnecessary costs for the Company.

46.     Indeed, at the time Plaintiff was hired, she was explicitly told that the Company needed someone based in New York City for her position in order to create New York City-based contacts and relationships due to the team's inability to penetrate the lucrative New York City market.  That the Company could so suddenly shift this strategy, and, coincidentally, decide to do so within mere weeks after Plaintiff disclosed her pregnancy, is highly suspect.

**Hollow Efforts to Place Plaintiff in a New Position within the Company**

47.    In a transparent bid to exculpate Thomson Reuters from obvious liability upon realizing that Plaintiff was picked for termination because of her pregnancy, the Company began to aggressively encourage Plaintiff to apply for other positions within Thomson Reuters, none of which were comparable to Plaintiff's former position.

48.    Even so, the Company's efforts to "find" Plaintiff a new role were insincere and artificial, as, despite applying for, interviewing and being unquestionably qualified for many positions, no offers of employment were extended.

49.    Notably, even weeks later, the Company still could not come up with a cogent justification for firing Plaintiff.

50.    In fact, on December 3, 2015, Plaintiff spoke to Tommy Williams ("Mr. Williams"), the Company's Vice President of Large Law Firms and Mr. Alston's manager, to discuss potential opportunities within Thomson Reuters.

51.    On this call, Mr. Williams immediately acknowledged Plaintiff's pregnancy, and apologized for what had happened to her.

52.    When Plaintiff pressed Mr. Williams as to why she had been chosen for termination, Mr. Williams was predictably unable to give her a straight answer, and stated only that there were "a lot of factors," and that the decision was "not something [he] could control."

53.    Further, the fact that Mr. Williams was only able to "squeeze" in a call with Plaintiff almost a month after her termination, even though Plaintiff had reached out to him for help finding alternate opportunities the day after she was told of her termination, further demonstrated the insincerity behind the Company's efforts to find an alternate role for Plaintiff.

54.     After excelling at Thomson Reuters, and during a time in which she hoped to celebrate and look forward to the birth of her first child, Plaintiff is left traumatized by the discriminatory termination she was subjected to by the Company, which has caused tremendous economic, emotional, and reputational harm.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of the FMLA)

55.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

56.     At all times relevant herein, Plaintiff was an "eligible employee" within the meaning of the Family Medical Leave Act, 29 U.S.C. § 2601.  Plaintiff, a full-time employee of Thomson Reuters, at all relevant times worked at least 1,250 hours in any 12-month period, and specifically, in the 12-month period preceding her termination.

57.     At all times relevant herein, Thomson Reuters was a "covered employer" within the meaning of the FMLA.  Thomson Reuters employs 50 or more employees in at least 20 calendar weeks within a 75 mile radius of the Company.

58.     By the actions described above, among others, Thomson Reuters violated the FMLA by unlawfully interfering with, restraining, or denying the exercise of Plaintiff's rights by, *inter alia*, terminating her employment shortly after Plaintiff announced her pregnancy, an action that would clearly deter employees from exercising their rights under the FMLA.

59.     As a direct and proximate result of Thomson Reuters' unlawful conduct in violation of the FMLA, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## SECOND CAUSE OF ACTION
### (Discrimination in Violation of the NYSHRL)

60.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

61.     By the actions described above, among others, Thomson Reuters discriminated against Plaintiff on the basis of her gender and/or pregnancy in violation of the New York State Human Rights Law, Article 15, § 290, *et. seq.*, by treating her differently from and less favorably than similarly situated employees who were not pregnant.

62.     Thomson Reuters terminated Plaintiff within weeks after she provided notice to them that she was pregnant, and informed her at the time of her termination that performance was not the only factor in the decision.

63.     As a direct and proximate result of Thomson Reuters' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

## THIRD CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)

64.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

65.     By the actions described above, among others, Thomson Reuters discriminated against Plaintiff on the basis of her gender and/or pregnancy in violation of the New York City Human Rights Law, Title 8 of the Administrative Code of the City of New York, § 8-107, *et seq.*, by treating her differently from and less favorably than similarly situated employees who were not pregnant.

66.     Thomson Reuters terminated Plaintiff within weeks after she provided notice to them that she was pregnant, and informed her at the time of her termination that performance was not the only factor in the decision.

67.     As a direct and proximate result of Thomson Reuters' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, to the greatest extent permitted under law, in addition to reasonable attorneys' fees and expenses.

68.     Thomson Reuters' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

### FOURTH CAUSE OF ACTION
#### (Violation of NYLL § 191)

69.     Plaintiff repeats, reiterates and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

70.     Thomson Reuters has refused to pay Plaintiff certain commissions she has earned based on sales she originated, in contravention of the terms of Plaintiff's employment, and in violation of the New York Labor Law ("NYLL").

71.     Thomson Reuter's willful refusal to pay Plaintiff's bonus is a violation of New York Labor Law § 191, which requires that employers pay employees' wages in accordance with their agreed upon terms of employment.

72.     The foregoing conduct of Thomson Reuters constitutes willful violations of the NYLL.

73.     Thomson Reuters' violation of the NYLL have significantly damaged Plaintiff, and entitles her to recover the total amount of her unpaid wages earned in accordance with her

agreed terms of employment, an additional amount in liquidated damages, and attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant for the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.      An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate for all monetary and/or economic damages;

C.      An award of damages against Defendant, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

D.      An award of punitive damages in an amount to be determined at trial;

E.      An award of liquidated damages in an amount to be determined at trial;

F.      Pre-judgment interest on all amounts due;

G.      An award of Plaintiff's reasonable attorneys' fees and costs; and

H.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.


Dated: February 24, 2016
       New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
       Jeanne M. Christensen
       Tanvir H. Rahman

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800
jchristensen@wigdorlaw.com
trahman@wigdorlaw.com

*Attorneys for Plaintiff*

14